[Cite as *In re O.G.*, 2013-Ohio-744.]

STATE OF OHIO ) IN THE COURT OF APPEALS
)ss: NINTH JUDICIAL DISTRICT
COUNTY OF LORAIN )

IN RE: O.G.    C.A. No.    12CA010294
     E.G.
     O.G.

         APPEAL FROM JUDGMENT
         ENTERED IN THE
         COURT OF COMMON PLEAS
         COUNTY OF LORAIN, OHIO
         CASE Nos.    10JC31637
                      10JC31638
                      10JC31639

DECISION AND JOURNAL ENTRY

Dated: March 4, 2013

---

HENSAL, Judge.

**{¶1}** Appellant, Olga N. ("Mother"), appeals from a judgment of the Lorain County Court of Common Pleas, Juvenile Division, that terminated her parental rights to three of her minor children and placed them in the permanent custody of Lorain County Children Services ("LCCS"). This Court affirms.

I.

**{¶2}** Mother is the natural mother of O.G., born April 24, 2008; E.G., born May 10, 2009; and O.G., born September 20, 2010. The father of the three children ("Father") participated in the trial court proceedings but is not a party to the appeal. Mother also has an older child who was at issue in the trial court proceedings. That child was ultimately placed in the legal custody of her father, however, and Mother has not appealed that disposition.

{¶3} On December 16, 2010, LCCS initiated this case by filing complaints, which alleged that all four of Mother's children were neglected and dependent and that the youngest child was also abused. The youngest child, then less than three months old, had been admitted to the hospital two days earlier with physical injuries that included a broken femur, bruising on the buttocks, torn skin around the lips, and burst blood vessels around the eyes. Although Mother stated that the baby's injuries had been caused by Mother's oldest child dropping her when she tried to carry her up the stairs, doctors concluded that the baby's injuries were inconsistent with an accidental fall. Because abuse was suspected, the case was referred to LCCS and the Lorain Police Department. The oldest child told LCCS that Father had punched and hit the baby and Mother eventually conceded that Father harmed the child. Although the details of the parents' criminal cases are not entirely clear from the record, each parent was charged with felony child endangering and Father was also charged with assault.

{¶4} LCCS had investigated this family one year earlier, in response to a referral that Father had physically abused one of the older children. A complaint was not filed at that time, however, because the parents moved with the children and LCCS was unable to locate them. In addition to abuse of the youngest child, the agency's investigation in this case revealed that Mother had repeatedly been the victim of domestic violence by Father. The agency also learned that Mother sometimes left the young children at home alone under the supervision of the oldest child, then only seven years old.

{¶5} Because violence in the home was the primary concern of LCCS, the initial case plan focused on the parents addressing domestic violence through education and counseling. Father was also required to address his substance abuse and mental health problems. From the beginning of this case, however, Father refused to work with LCCS. Because Father posed a

threat to the entire family and refused to address his parenting problems, the agency amended the reunification plan to require Mother to end her violent relationship with him and further address her domestic violence and parenting problems through education and counseling.

{¶6} The caseworker encouraged Mother to engage in reunification services before the initial case plan was filed, emphasizing that the sooner Mother completed domestic violence classes and counseling, the sooner she could be reunified with her children. Although Mother repeatedly told the caseworker that she would end her relationship with Father and work on the goals of the case plan, she continued to live with Father and did not engage in any educational or counseling services for most of the next year. Mother ultimately moved out of Father's home and obtained a civil protection order against him in September or October of 2011, but the two continued to spend time together in violation of the order.

{¶7} By the end of 2011 or beginning or 2012, Father was incarcerated on unrelated criminal charges and was facing a four-year prison term. Consequently, Mother and Father ended their relationship. Although Mother reported that she was engaging in reunification services, the caseworker and guardian ad litem were unable to verify her compliance or progress because she refused to sign releases or signed releases and later revoked them. Moreover, Mother almost immediately became romantically involved with another man, but refused to provide LCCS with information about him.

{¶8} Although LCCS had been able to place the children with two maternal aunts, the children were removed from the aunts' homes after a few months due to concerns about their safety and well-being in those homes. On March 12, 2012, more than 14 months after the children had been placed in its temporary custody, the State moved for permanent custody of O.G., E.G., and O.G. Following three days of hearing that began on June 1 and ended on July

25, 2012, the trial court found that the children had been in the temporary custody of LCCS for more than 12 of the prior 22 months and that permanent custody was in their best interests. Consequently, it terminated parental rights and placed the children in the permanent custody of LCCS. Mother appeals and raises two assignments of error, which this Court consolidates for ease of review.

I.

**ASSIGNMENT OF ERROR I**

THE TRIAL COURT'S DECISION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE PURSUANT TO O.R.C. 2151.414(B)(2).

**ASSIGNMENT OF ERROR II**

THE TRIAL COURT ERRED IN NOT FOLLOWING THE GUARDIAN AD LITEM RECOMMENDATION FOR AN EXTENSION OF TIME.

**{¶9}** Mother's first assignment of error is that the trial court's permanent custody decision was not supported by the evidence presented at the hearing. Her second assignment of error challenges the trial court's best interest determination insofar as the court failed to follow the recommendation of the guardian ad litem to extend temporary custody. The evidence presented at the hearing, however, fully supported the trial court's permanent custody decision, including its rejection of the guardian's recommendation.

**{¶10}** Before a juvenile court may terminate parental rights and award to a proper moving agency permanent custody of children, it must find clear and convincing evidence of both prongs of the permanent custody test that: (1) the children are abandoned, orphaned, have been in the temporary custody of the agency for at least 12 months of the prior 22 months, or that the children cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) the grant of permanent

custody to the agency is in the best interests of the children, based on an analysis under R.C. 2151.414(D). *See* R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 99 (1996).

{¶11} The trial court found that the first prong of the permanent custody test was satisfied because the children had been in the temporary custody of LCCS for more than 12 of the prior 22 months. Mother does not contest that finding, but instead argues that the trial court lacked evidence to support its conclusion that permanent custody was in the best interest of the children.

{¶12} When determining whether a grant of permanent custody is in a child's best interests, the juvenile court must consider the following factors:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency * * *.

R.C. 2151.414(D)(1)(a)-(d).[1]

---

[1] The factor set forth in R.C. 2151.414(D)(1)(e) does not apply to the facts of this case pertaining to Mother because her child endangering charges remained pending at the time of the hearing. *See* R.C. 2151.414(E)(7).

{¶13} During the twenty months that the children had lived outside Mother's custody, Mother saw them no more than once a week during supervised visitation. During June 2011, pursuant to an order of the court handling her criminal charges, Mother was prohibited from having any contact with the children. While the children were placed with their maternal aunts for a few months, however, the aunts permitted Mother to have contact with them in violation of the order. The children were removed from the aunts' homes for that reason and others. By September 2011, however, the no contact order was modified to permit Mother to have contact with the children who had not been injured. Mother resumed weekly, supervised visits with her older children but she continued to have no contact with the youngest child.

{¶14} Mother's limited interaction with her young children was never expanded beyond weekly, supervised visits because she would not comply with the requirements of the case plan. Specifically, aside from lacking stable employment and housing, although she eventually engaged in some domestic violence classes and counseling, Mother never demonstrated that she would put the needs of her children ahead of her own and protect them from inappropriate men. During the first year of this case, Mother continued to maintain a relationship with Father and did not comply with the reunification goals of the case plan. Because she was facing criminal charges, on the advice of counsel, she did not discuss the baby's injury with LCCS or police. Nonetheless, although LCCS wanted Mother to accept responsibility for the child's injury, that was not a specific requirement of the case plan. Aside from the child's injury, Mother admitted that there had been ongoing violence by Father in her home, but she did not adequately address that problem and take steps to protect the safety of her children.

{¶15} It was apparent to LCCS that Mother could not provide a safe home for the children if she continued her relationship with Father, who controlled the entire family with

violence and fear, particularly because Father refused to address his violent behavior or mental health and substance abuse problems. Father was described by several witnesses as a violent and controlling man who had a "short fuse." There was lay testimony that his anger problem was exacerbated by untreated mental illness and substance abuse. Mother's relationship with him had been plagued by his ongoing violent and controlling behavior. For example, one family member described an incident in which Mother tried to jump out of a moving car while she was pregnant with one of the children because Father was threatening to kill her. The caseworker also testified about a telephone call to Mother during which she could hear Father in the background yelling at Mother to get off the phone right before the call was disconnected.

{¶16} After Father went to prison and Mother ended her relationship with him, her participation in reunification services improved. At about the same time, however, she began a relationship with another man. LCCS was concerned that, although Mother had ended her unhealthy relationship with Father, she immediately became involved with another man. She would not provide the caseworker with any information about the man, who would potentially have contact with her children, except that he was a truck driver who traveled out of state. Mother often traveled with the man and, consequently, did not work on the case plan while she was out of the area. The caseworker eventually discovered the identity of the man and that he had a criminal history.

{¶17} Mother's refusal to communicate with the caseworker, guardian ad litem, and others posed an obstacle to reunification throughout this case. She changed residences repeatedly but did not keep the caseworker informed with up-to-date contact information and often would not speak to the caseworker when she did reach her by telephone. The caseworker testified that she received more information from Mother's sisters and parents than she did from

Mother herself. The guardian ad litem similarly testified that "it's like pulling teeth to get information" from Mother.

{¶18} It was apparent to the caseworker that Father had prevented Mother from obtaining reunification services, but Mother would not follow the caseworker's advice to leave him. Moreover, even after Father was incarcerated, Mother did not make significant progress toward reunification. At the time of the hearing, Mother had not completed domestic violence classes or counseling, during the 19 months that this case was pending. She continued to lack stable housing and employment, but was financially dependent on a man, who had no bond with her children and had not been approved by LCCS as a suitable person to have contact with them. Mother was unable to meet her own needs without that man, much less the needs of her children. Moreover, it was further revealed at the hearing that Mother was pregnant with another child, but she had not disclosed her pregnancy to her counselor, the guardian ad litem, or the caseworker.

{¶19} In the homes of their respective foster parents, on the other hand, the children had developed loving relationships in safe and stable environments. The children had been placed in two separate foster homes due to the special needs of the injured baby. They remained in the same homes throughout most of this case, except for a period of a few months when they were placed with maternal aunts. The foster parents testified about the positive changes in the children that had occurred during this case. The youngest child arrived in the foster home at the age of approximately three months, with extensive injuries that required special care. The foster mother explained that even changing the baby's diaper was a two-person job because she wore a harness on her broken leg, which had to be carefully maneuvered during diaper changing to maintain the appropriate tension on her leg. Almost one and one-half years after her injury, the child continued to require special medical care. There was concern that the injured leg may

require surgery because, although the child was walking, she still did not move the injured leg properly. Her initial symptoms of eye hemorrhaging had also suggested that she had been shaken, and it was still uncertain whether she had sustained any brain injury.

{¶20} The foster mother further testified that the child is now otherwise happy and healthy. She had maintained a relationship with the foster mother of the other children and arranged for the three siblings to play together on a regular basis. They planned to maintain a relationship between the siblings. She further testified that she loves this child and would like to adopt her.

{¶21} The foster mother of the older two children testified that, when they arrived in her home, they were aggressive and lacked any self-control. They acted out continually by hitting, spitting, biting, and throwing objects. She explained that, with firm boundaries in her home, the children's behavior had improved and they had become assimilated into her family. She also expressed a desire to adopt the children if the trial court terminated parental rights. She had been encouraging a relationship between the two siblings and their youngest sister, as well as their older half-sibling, who lived in Florida with her father. She planned to continue maintaining the sibling relationships.

{¶22} The guardian and the caseworker testified about the positive interactions and interrelationships between the children and their foster parents. The guardian ad litem had observed the children in their foster homes on several occasions and found the homes and caregivers to be appropriate and opined that the children had become bonded with those families. He opined that the children were "in great hands" in the foster homes. The caseworker further testified that the children were "blossoming" in their respective foster homes and that the two older children had become "completely different" as they developed in their foster home.

{¶23} The second best interest factor required the trial court to consider the wishes of the children as stated by the children themselves or by the guardian ad litem. Because the oldest of the three children was only four years old at the time of the hearing, the guardian ad litem spoke for them. Although he believed that Mother was not ready to have the children returned to her custody at that time, he recommended that the trial court extend temporary custody for another six months. Mother has argued that the trial court erred in failing to follow that recommendation.

{¶24} Although the trial court was required to consider the guardian's recommendation as well as each of the other statutory best interest factors, as this Court has emphasized, "[t]he best interest test is a balancing test of several factors and the Supreme Court has stressed that no single factor is controlling." *In re C.G.*, 9th Dist. No. 24097 and 24099, 2008-Ohio-3773, ¶ 28, citing *In re Schaefer,* 111 Ohio St.3d 498, 2006–Ohio–5513, at ¶ 56. It is apparent from the trial court's judgment entry and its extensive questioning of the guardian ad litem that the court considered the guardian's recommendation but reasonably concluded that permanent custody, not an extension of temporary custody, was in the best interests of the children.

{¶25} To begin with, the guardian ad litem and Mother were both under the mistaken impression that the trial court had authority to extend temporary custody for another six months. Although a trial court has authority to grant two six-month extensions of the initial temporary custody order, R.C. 2151.353(F) was amended, effective April 7, 2009, to clarify that the trial court cannot extend temporary custody beyond the two-year sunset date:

> [T]he court shall not order an existing temporary custody order to continue beyond two years after the date on which the complaint was filed or the child was first placed into shelter care, whichever date is earlier, * * *.

Identical language was likewise added to R.C. 2151.415(D)(4), which had previously provided simply that "a court shall not grant an agency more than two extensions of temporary custody[.]"

**{¶26}** The complaints in this case were filed on December 16, 2010, and the children were placed in emergency temporary custody of LCCS the same day. Therefore, December 16, 2012 was the two-year sunset date and the trial court lacked authority to extend temporary custody beyond that date. Because the permanent custody hearing concluded on July 25, 2012, less than five months before the two-year sunset date of December 16, 2012, the trial court could not extend temporary custody for any more than another few months.

**{¶27}** In addition to being constrained by statutory time limits, the trial court had authority to extend temporary custody only if it first found, based on clear and convincing evidence, that the extension was in the best interest of the children, that there had been "significant progress" on the case plan, and that there was "reasonable cause to believe that the child[ren] [would] be reunified with one of the parents or otherwise permanently placed within the period of extension." R.C. 2151.415(D)(1). *See In re A.B.*, 9th Dist. No. 25460, 2010-Ohio-5464, ¶ 14. The evidence before the trial court failed to demonstrate that any of these prerequisites had been satisfied.

**{¶28}** Although the guardian ad litem recommended extending temporary custody, he recommended an extension primarily because Mother had not been given a full two years to work on reunification and, according to what she had told him, she was complying with the requirements of the case plan. The guardian conceded that he had been unable to confirm whether Mother was actually complying with the case plan because she had not signed the necessary releases. He also admitted that permanent custody may be "inevitable" if Mother was not, in fact, complying as she had represented.

{¶29} As explained above, Mother's behavior demonstrated that she had not made significant progress toward reunification with her children and that extending temporary custody was not in their best interests. Moreover, even if she had been engaged in counseling, the undisputed evidence revealed that Mother had not been open and honest with her counselor. Mother told her counselor that she had completed domestic violence classes, but she had not, and she had not disclosed to her counselor that she was again pregnant. It was unclear whether she had informed the counselor or the guardian ad litem about her new relationship with another man and that she was traveling with him. Consequently, the guardian's recommendation to extend temporary custody was not supported by the evidence.

{¶30} The custodial history of the children included a period of over 17 months in the temporary custody of LCCS. Because the children were only four, three, and less than two years old at the time of the hearing, this time period represented a significant portion of their young lives. This Court has repeatedly stressed, however, that "'the time period in and of itself cannot be held against the parent without considering the reasons for it and the implications that it had on this child.'" *In re C.M.*, 9th Dist. No. 21372, 2003-Ohio-5040, ¶ 16, quoting *In re Smith*, 9th Dist. No. 20711, 2002 WL 5178, *5 (Jan. 2, 2002). During the early months of the case plan, Mother failed to participate in any reunification services, although she repeatedly told the caseworker that she would. By the time the first year of case came to an end, however, Mother was participating in reunification services and was ending her relationship with Father. Therefore, the trial court extended temporary custody to allow her more time to work toward reunification with her children. During the next six months, however, although she engaged in some counseling, she otherwise made no progress toward providing a safe and stable home for

her children. The children, on the other hand, had been flourishing in their foster homes, where they had spent most of their lives.

{¶31} Because the children had spent most of their lives living in temporary placements, they were in need of a legally secure permanent placement. Mother was not prepared to provide a safe permanent home for them and LCCS had been unable to find any suitable relatives who could. The agency had considered several different relatives who were willing to provide homes for the children, but initially ruled out some of them because they had drug problems, a criminal history, or past involvement with children services agencies. LCCS did place the children in the homes of two maternal aunts, but later removed them because the aunts permitted Mother and/or Father to have repeated contact with the children in violation of the criminal court order. LCCS had further concerns that the aunts were not able to provide for the children's basic needs and that the maternal grandfather, who lived with one of the aunts, had repeatedly disciplined the children by beating them with a belt or threatening to do so.

{¶32} Because LCCS was unable to find any other suitable relatives to take custody of the children, they were returned to their original foster homes. They almost immediately readjusted and became comfortable in those homes, where they continued to reside throughout the remainder of the case. Because the foster parents had expressed interest in adopting the children, the trial court reasonably concluded that a legally secure permanent placement could best be achieved by granting the agency's motion for permanent custody.

{¶33} Having reviewed all of the evidence in the record, this Court concludes that the trial court had clear and convincing evidence before it to support its finding that permanent custody was in the best interests of these children. Mother's assignments of error are overruled.

III.

{¶34} Mother's assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

JENNIFER HENSAL
FOR THE COURT

BELFANCE, P. J.
WHITMORE, J.
CONCUR.

APPEARANCES:

BARBARA A. WEBBER, Attorney at Law, for Appellant.

DENNIS P. WILL, Prosecuting Attorney, and AMY L. PRICE, Assistant Prosecuting Attorney, for Appellee.